**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:19-CV-80781-ROSENBERG/REINHART**

L2 CAPITAL, LLC,

      Plaintiff,

v.

ANTHONY L.G., PLLC f/k/a
LEGAL & COMPLIANCE LLC;
LAURA ANTHONY, ESQ.; and
CHAD FRIEND, ESQ.,

      Defendants.

_____/

**DEFENDANTS' <u>VERIFIED</u>**
**<u>ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT</u>**

Defendants ANTHONY L.G., PLLC f/k/a LEGAL & COMPLIANCE LLC (the "Firm"),

LAURA ANTHONY, ESQ. ("Mrs. Anthony, Esq."); and CHAD FRIEND, ESQ. ("Mr. Friend")

(collectively, the "Defendants"), by and through their undersigned counsel, hereby file their

<u>Verified</u> Answer and Affirmative Defenses to Plaintiff L2 Capital, LLC's Complaint, and state:

**[PLAINTIFF'S] INTRODUCTION[1]**

1.     "This is a legal malpractice case. Through this Complaint, L2 seeks to recover the

significant damages caused by Legal & Compliance, Anthony, and Friend's representation of L2

in certain investment/funding transactions. Legal & Compliance, Anthony and Friend's

lawyering failures were both pervasive and egregious. As described more fully below, they

---

[1]     This paragraph is directly quoted from the Complaint. Defendants deny the factual basis of Plaintiff's description of the case in their counter-introduction below.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

materially contributed and proximately caused L2 to suffer damages in excess of 8 Million Dollars."

**DEFENDANTS' ANSWER and COUNTER-INTRODUCTION:**

Defendants admit that Plaintiff filed an action asserting claims characterized as legal malpractice, but strongly deny that any malpractice occurred or that Plaintiff was damaged in any way due to any alleged actions or inactions by the Defendants.  Defendants deny all other allegations contained in paragraph 1.

As demonstrated by the Answer and Affirmative Defenses, Plaintiff's claims are not only meritless, but part and parcel with L2's and its principal's practice of engaging in pervasive and vexatious litigation throughout the country.[2]

The Florida-based Defendants, a law firm, its principal, and the partner who actually performed limited and specific securities transaction services for L2, are all well-known and highly respected securities transaction practitioners in the small cap and mid-market securities industry.  In almost 20 years of operations, neither the Firm nor any of its attorneys have ever been sued for malpractice, or even accused of committing malpractice. That record speaks for itself.

---

[2]     For example, Long filed a Chapter 7 bankruptcy petition on October 16, 2009 in the District of Kansas. A creditor filed an adversary proceeding disputing the dischargeability of certain debts incurred by Long because of Long's fraudulent actions. After considering Long's testimony during a two-day evidentiary hearing, the Bankruptcy Court agreed with the creditor that the subject debt was non-dischargeable due to Long having engaged in a fraudulent mortgage scheme.  In reaching its conclusions, the Bankruptcy Court found "that much of Long's testimony was not believeable and that his testimony and portions of the record were `riddled with examples of his lack of credibility…'" Long v. Yoder (In re Long), 538 B.R. 108, 117 (D. Kan. 2015)

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

Critically, at no time prior to the filing of this action did L2 or its principal, Adam Long, contact the Defendants or raise any concerns about professional malpractice, breach of fiduciary duty, or breach of contract.  To the contrary, this lawsuit is nothing more than a manufactured attempt by L2 to attempt to profit from false accusations against the Defendants and their good names, all of whom L2 views as mere "deep pockets," following the end of L2's attorney-client relationship with the Firm and Mr. Friend.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exclusive of attorney's fees and costs exceeds Seventy Five Thousand Dollars.

**ANSWER:**    Admitted for jurisdictional purposes, only.

3.      Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391 because Defendants Legal & Compliance, Anthony and Friend reside and maintain their office and practice in this District, and a substantial part of the events or omissions giving rise to L2's claims occurred in this District.

**ANSWER:**    Defendants admit that venue is appropriate in the Southern District of Florida; however, Defendants deny that any events or omissions give rise to the asserted claims for which Defendants deny any purported liability or damages.

## PARTIES

4.      Plaintiff L2 is a Kansas limited liability company with a principal place of business at 411 Dorado Beach, East Dorado, Puerto Rico. The sole member of Plaintiff L2 is Adam Long, who is domiciled in, a resident, and citizen of Puerto Rico.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 4 and must deny same.  However, upon information and belief, Adam Long is actually a resident of Kansas, who claims Puerto Rico residency in an attempt to avoid tax liability.

5.      Defendant Legal & Compliance[3] is a Florida limited liability company, and is a corporate, securities and business transactions law firm that engages in the practice of law in the State of Florida and elsewhere, and it maintains its principal place of business at 625 N. Flagler Drive, Ste, 600, West Palm Beach, FL 33401. See, 2019 Florida Limited Liability Company Annual Report for ANTHONY L.G., PLLC filed with the Florida Secretary of State, attached as Exhibit "B"; See also, Articles of Organization for Legal & Compliance. LLC filed with the Florida Department of State, Division of Corporations, on October 29, 2001, and attached as Exhibit "C".

**ANSWER:**   Defendants admit the allegations contained in the first sentence of Paragraph 5.  The documents referenced in the remaining allegations of Paragraph 5 and footnote 1 speak for themselves. Further, the incomplete date referenced for Exhibit C should be 2001.

6.      Upon information and belief, and specifically based on the Articles of Organization for Legal & Compliance, at Article IV, filed with the Florida Department of State, Division of Corporations, the "single member" of Defendant Legal & Compliance is Defendant

---

[3]      Legal & Compliance, LLC filed a Name Change to Anthony L.G., PLLC, which became effective on October 9, 2018. See, Articles of Amendment to Articles of Organization of Legal & Compliance, LLC (a Florida Limited Liability Company) dated October 13, 2018 and filed with Florida Department of State, Division of Corporations, attached hereto as Exhibit "A".

Laura E. Anthony, who, is domiciled in, is a resident and citizen of Florida[4]. See, Articles of Organization for Legal & Compliance. LLC filed with the Florida Department of State, Division of Corporations, on October 29, 200, at paragraph IV, attached as Exhibit "C".

**ANSWER:**   Defendants admit the allegations contained in the first sentence of Paragraph 6.  The documents referenced in the remaining allegations of Paragraph 6 and footnote 2 speak for themselves.

7.      Defendant Anthony is a licensed Florida lawyer, and is the founding and managing Partner of Defendant Legal & Compliance. As Legal & Compliance's website states, "For 23 years Ms. Anthony has focused her law practice on small and mid-cap private and public companies, the OTC market, NASDAQ, NYSE MKT, going public transactions, mergers and acquisitions, private placement and corporate finance transactions, Regulation A/A+, Exchange Act and other regulatory reporting requirements, FINRA and DTC requirements, state and federal securities laws, crowdfunding, general corporate law and complex business transactions." Legal & Compliance website and webpage for Anthony is attached as Exhibit "D".

**ANSWER:**   Defendants admit the allegations contained in Paragraph 7.  The website referenced in the remaining allegations of Paragraph 7 speaks for itself.  Mrs. Anthony had no personal involvement with any of the L2 transactions complained of in the Complaint, and was never personally retained by L2 or Adam Long to perform any work for L2, at any time, as opposed to Mr. Friend and the Firm, generally.

---

[4]      Although the Articles of Organization for Legal & Compliance, at Article IV, identifies Laura E. Anthony as its sole member, and no amendment thereto, other than the name change to Anthony L.G., PLLC, was filed with Florida Department of State, Legal & Compliance identifies 2 additional partners, one of which is Defendant Friend, and each of whom, upon information and belief, are domiciled in and citizens of the state of Florida.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

8.      Upon further information and belief, Defendant Friend is domiciled in, is a resident and citizen of Florida, is admitted to the Florida Bar, is a licensed Florida lawyer, and is a Partner of Defendant Legal & Compliance. As Legal & Compliance's website states, Friend has been a Partner since 2018 and "specializes in buyer side transactional work (represents funds and investors)" and "Friend resides in Palm Beach County with his wife and two sons". Legal & Compliance website and webpage for Friend is attached as Exhibit "E". (Legal & Compliance, Anthony and Friend will be collectively referred to herein as "Defendants".)

**ANSWER:**   Defendants admit the allegations contained in the first sentence of Paragraph 8.  The documents referenced in the remaining allegations of Paragraph 8 speak for themselves.

## FACTUAL BACKGROUND

9.      L2 Capital was organized and incorporated in November of 2016.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 9 and must deny same.

10.     L2's principal, Adam Long, before organizing and incorporating L2 and while in his previous employment, retained the Defendants for certain legal representation.

**ANSWER:**   Defendants admit that the Firm performed legal services for Adam Long's prior employer, when they first became familiar with Adam Long.

11.     Upon creating L2, Mr. Long sought Defendants' representation to prepare L2's corporate organizational documents and to represent L2 in certain investment transactions.

**ANSWER:**   Denied.   Defendants did not prepare the corporate organizational documents for L2.  Defendants admit that the Firm was retained to conduct a cursory review of a

private placement memorandum and certain related ancillary documentation for Adam Long, initially. The Firm and Mr. Friend were subsequently retained to perform limited legal services for specific securities transactions, always at a flat rate, which legal services never included acting as an outside general counsel for L2 or Adam Long, and never included any form of negotiation or due diligence associated with the transaction for Plaintiff.

12.     In or around December of 2016, L2 retained the Defendants to represent them in its first investment transaction, and afterwards L2 routinely engaged Defendants to represent it in various transactional matters.

**ANSWER:**   Denied as phrased.  Defendants admit that L2 retained the Firm and Mr. Friend to perform limited legal services for specific securities transactions, always at a flat rate, which legal services never included acting as an outside general counsel for L2 or Adam Long, and never included any form of negotiation or due diligence associated with the transaction for Plaintiff.

13.     Defendants represented L2 in several significant transactions, in which the Defendants' representation caused L2 substantial damage.

**ANSWER:**   Denied as phrased.  Defendants admit that L2 retained the Firm and Mr. Friend to perform limited legal services for specific securities transactions.   Defendants vehemently deny that any representation by the Firm or Mr. Friend caused any damages to L2.

### The MoneyonMobile, Inc. Transaction- August 29, 2017

14.     L2 loaned a total of approximately 1 Million Dollars to MoneyonMobile, Inc., a Texas microcap technology company that provides digital payment services in India ("MoneyonMobile"), in separate tranches pursuant to a Securities Purchase Agreement executed on August 29, 2017, an 8% Convertible Promissory Note in the principal amount of $1,136,363,

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

Common Stock Warrant Agreement, and Irrevocable Transfer Agent Instructions (the Securities Purchase Agreement, Convertible Promissory Note, Common Stock Warrant Agreement, and Irrevocable Transfer Agent Instructions shall be collectively referred to herein as the "MoneyonMobile Transactional Documents"). See MoneyonMobile Transactional Documents attached collectively as Exhibit "F".

**ANSWER:**   Defendants admit the allegations contained in the first sentence of Paragraph 14.   The referenced documents in the remainder of the paragraph speak for themselves.

15.     Friend and Legal & Compliance, on L2's behalf, drafted the MoneyonMobile Transactional Documents.

**ANSWER:**   The Firm and Mr. Friend admit that they were asked to prepare certain document at the direction of L2 and Adam Long, based on specific instructions and signed term sheets completed and provided by L2 and Adam Long, but that the Firm and Mr. Friend did not participate in any due diligence or any of the negotiations that led to the specific terms ultimately agreed upon between MoneyonMobile and L2.   All such negotiations were conducted or overseen by Adam Long, without any of the Defendants' participation.   Ultimately, Mr. Friend was presented with the MoneyonMobile signed term sheet and asked to document the deal, which was done in a matter of hours and those drafts were sent by Mr. Friend to Adam Long for review.   The draft documentation included the standard anti-dilution protection that Adam Long had previously approved in many transactions that Mr. Friend drafted documentation for, as well as transactions in which other legal counsel represented Adam Long both prior to and subsequent to the MoneyonMobile transactions.

16.     Prior to L2 entering into the loan transaction with MoneyonMobile, prior to Friend and Legal & Compliance drafting the MoneyonMobile Transactional Documents, and prior to L2 executing the MoneyonMobile Transactional Documents, MoneyonMobile contemplated completing a 1 for 20 reverse stock split in order to up-list to the NASDAQ, which it disclosed in its Form 10-Qs for the quarters ending June 30, 2017 and September 30, 2017 ("On May 1, 2017, the Company held a special meeting of shareholders pursuant to notice duly given. At the special meeting, the Company submitted for approval by its shareholders proposals (i) to amend its Amended and Restated Certificate of Formation-For-Profit Corporation to effect a reverse share split with the Company's issued and outstanding common stock, par value $0.001 per share, at a ratio of between 1-for-5 and 1-for-20 (the 'Exchange Range'), with the ratio within such Exchange Range to be determined at the discretion of the Board (the 'Reverse Share Split') and the Reverse Share Split shall be effected at such time as the Board deems proper and ready...."). See MoneyonMobile Form 10-Q for the quarter ending September 30, 2017, at page 18, paragraph 11 [publicly available].

**ANSWER:**    Defendants do not have sufficient information to admit or deny the allegations in paragraph 16 and must deny same.  The referenced document speaks for itself.

17.     Thus, Friend and Legal & Compliance knew or should have known of the intended reverse stock split and should have addressed the same with specific terms in the MoneyonMobile Transactional Documents, but did not.

**ANSWER:**    Denied.  While the Firm and Mr. Friend were retained to perform limited legal services for the MoneyonMobile transaction, the legal services did not include performing any form of due diligence or negotiations with MoneyonMobile, and it was L2 and Adam Long's

custom, practice, and desire to handle all facets of the underlying negotiations and specific deal terms themselves, without the participation of counsel.  Once negotiations were completed, L2 and Adam Long forwarded term sheets to Mr. Friend who created the documentation based upon and limited to the specific deal terms reached by the parties to the transaction.  At no time did L2 or Adam Long address the issue of a reverse stock split or direct Mr. Friend or the Firm to provide additional terms providing for such an event.  Had such instructions been given by L2 or Adam Long, Mr. Friend would have included additional terms in the draft documentation.  L2 and Adam Long did not request any additional analysis or input from Mr. Friend.

18.     In accordance with the MoneyonMobile Convertible Promissory Note, on August 30, 2017, L2 funded the first tranche of $568,181.50 (the "First Tranche"), on September 21, 2017 L2 funded the second tranche of $284,090.75 (the "Second Tranche"), on October 12, 2017 L2 funded the third tranche of $170,454.45 (the "Third Tranche"), and the fourth tranche of $113,636.30 (the "Fourth Tranche") was funded by L2 on November 8, 2017.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 18 and must deny same.

19.     In connection with the funding of the First Tranche, MoneyonMobile issued a warrant to purchase 688,704 shares of its common stock (the "First Warrant"), in connection with the funding of the Second Tranche, MoneyonMobile issued a warrant to purchase 344,352 shares of its common stock (the "Second Warrant"), in connection with the funding of the Third Tranche, MoneyonMobile issued a warrant to purchase 206,612 shares of its common stock (the "Third Warrant"), and in connection with the funding of the Fourth Tranche, MoneyonMobile issued a warrant to purchase 137,741 shares of its common stock (the "Fourth Warrant") (the

First, Second, Third and Fourth Warrants are collectively referred to as the "MoneyonMobile Warrants").

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 19 and must deny same.

20.     The Common Stock Warrants, drafted by Friend and Legal & Compliance and executed with respect to each of the tranches, provided that "if the Market Price of one share of Common Stock is greater than the Exercise Price, and the Warrant Shares are not registered at that time under an effective registration statement of the Company and able to be deposited pursuant to such effective registration statement", then L2 could "elect to receive Warrant Shares pursuant to a cashless exercise, in lieu of a cash exercise, equal to the value of this Warrant determined in the manner described below (or of any portion thereof remaining unexercised) by surrender of th[e] Warrant and a Notice of Exercise", in which event MoneyonMobile was required to issue to L2 a number of Common Stock computed using the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where X = the number of Shares to be issued to Holder.
Y = the number of Warrant Shares that the Holder elects to purchase under this Warrant
(at the date of such calculation).
A = the Market Price (at the date of such calculation).
B = Exercise Price (as adjusted to the date of such calculation).

See Exhibit "F".

**ANSWER:**   Exhibit F speaks for itself.

21.     After the Note and First and Second Warrants had been issued and outstanding for six months, L2 asked Friend to provide MoneyonMobile with a calculation for the warrants, pursuant to the above described formula outlined in the Common Stock Warrant.

**ANSWER:** The Firm and Mr. Friend admit that L2 asked Mr. Friend to provide MoneyonMobile with a calculation for the warrants, pursuant to the parties' negotiated and executed documentation.

22. Friend and Legal & Compliance provided the calculation for the warrants on L2's behalf to MoneyonMobile.

**ANSWER:** Defendants admit that Mr. Friend provided calculations as directed by L2 and Adam Long.

23. MoneyonMobile disputed Friend and Legal & Compliance's calculation and argued that the warrant terms, drafted by Friend and Legal & Compliance, were ambiguous and that the anti-dilution and ratchet provisions could not be used simultaneously.

**ANSWER:** Defendants admit that MoneyonMobile disputed the calculations.

24. In response, Friend and Legal & Compliance revised the calculation for the MoneyonMobile warrants to MoneyonMobile's benefit and for a reduced number of shares to L2.

**ANSWER:** Defendant admit that Mr. Friend revised the calculations pursuant to instructions from L2 and Adam Long.

25. On March 26, 2018, per Friend's advice and calculations, L2 executed and submitted an exercise notice for the cashless purchase of the reduced number of MoneyonMobile common stock.

**ANSWER:** Denied as phrased. L2 and Adam Long prepared and executed their exercise notice(s) based on their own review, experience, and decision making.

26. In connection with this exercise, although MoneyonMobile continued to challenge

Friend's revised calculations, it did not attempt to block L2's exercise and the transfer agent did deliver 1,176,095 shares of MoneyonMobile's common stock to L2 in exchange for a full cashless exercise of both the First Warrant and Second Warrant.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 26 and must deny same.

27.     On the following day, Legal & Compliance issued a Rule 144 Opinion which stated, in relevant part, that it was "of the opinion that the Shares issued pursuant to the exercise of the Warrant, under the circumstances set forth above, may be sold immediately in a public market or by private transfer by L2 Capital without registration under the Act in reliance on the Rule 144(b) exemption from registration and need not bear a restrictive legend pertaining to any sale or disposition of said shares." See Legal & Compliance Rule 144 Opinion attached as Exhibit "G".

**ANSWER:**   Exhibit G speaks for itself.  The Rule 144 Opinion was issued upon receipt of a signed exercise notice from L2 and Adam Long, at the direction of L2 and Adam Long.

28.     As a result of MoneyonMobile challenges to Friend and Legal & Compliance 's calculation for the First and Second Warrants and L2's concession as a result thereof, L2 advised Friend that the warrant language in the documents needed to be clearer in any new transaction so that L2's calculation were not debatable or could in any way be construed as ambiguous.

**ANSWER:**   Denied as phrased. Adam Long stated that the warrant is the same warrant that Adam Long uses in almost all investments.  Adam Long stated that the provisions were "black and white." Adam Long voluntarily agreed to forgo using the $0.1875 pricing as long as MoneyonMobile did not escalate the conflict.

29.     On or about April 24, 2018, as MoneyonMobile had previously disclosed in its Form 10-Qs for the quarters ending June 30, 2017 and September 30, 2017, MoneyonMobile executed a one-for-twenty reverse split of its common stock, and as a consequence each shareholder then owned one-twentieth of the original shares of common stock, but the value of each share had increased twenty-fold.

ANSWER:   Defendants do not have sufficient information to admit or deny the allegations in paragraph 29 and must deny same.   The referenced document(s) speak for itself/themselves.

30.     Due to the reverse split the MoneyonMobile stock value increased to a high of $10 per share.

ANSWER:   Defendants do not have sufficient information to admit or deny the allegations in paragraph 30 and must deny same.

31.     At that time L2 had held the 3 [sic] and 4th Warrants for more than six months and due to the increase in value of the MoneyonMobile common stock as a result of the reverse split, L2 sought to exercise its remaining MoneyonMobile warrants.

ANSWER:   Defendants do not have sufficient information to admit or deny the allegations in paragraph 31 and must deny same.

32.     L2 requested that Friend and Legal & Compliance prepare the necessary paperwork and provide a calculation for the warrants.

ANSWER:   Admitted.

33.     At that time Friend and Legal & Compliance did the calculation and explained to L2 that the documents, which Friend and Legal &Compliance drafted, negotiated and advised L2

to execute, including specifically the Warrant Agreement, did not include any language that addressed stock splits, and did not include any terms that addressed whether the number of common shares to be issued would adjust if MoneyonMobile executed a stock split. See Exhibit "F".

**ANSWER:** Denied as phrased. The Firm and Mr. Friend admit that they were asked to prepare certain document at the direction of L2 and Adam Long, based on specific instructions and term sheets completed and provided by L2 and Adam Long, but that the Firm and Mr. Friend did not participate in the negotiation of the transaction, any due diligence, and/or any of the specific terms ultimately agreed upon between MoneyonMobile and L2 or Adam Long, without any of the Defendants' participation. Adam Long directed Greg Share from L2 to prepare the exercise notice, which Adam Long subsequently reviewed and signed. Further, Exhibit F speaks for itself.

34. Transactional documents usually include a provision to account for stock splits, both forward and reverse splits, especially under circumstances where the entity has publicly disclosed its intention to execute a reverse stock split, and in fact, MoneyonMobile had entered into a funding transaction with an unrelated entity prior to L2's funding that involved a warrant agreement that included language that addressed stock splits.

**ANSWER:** Denied as phrased. Adam Long is an extremely sophisticated fund manager and former-licensed and registered broker[5] with extraordinary investment experience on

---

[5] While not currently registered as a broker, according to publicly available information on BrokerCheck® by the Financial Industry Regulatory Authority ("FINRA"), at various times during the years 2003 through 2016, Adam Long possessed basic, advanced, and principal/supervisory brokerage licenses, including: **Series 4** (Registered Options Principal Examination), **Series 6** (Investment Company Products/Variable Contracts Representative

both the buy and sell sides of private equity transactions like the transactions referenced in the Complaint, reviewing paperwork for these types of deals, both before and after forming his own fund, L2. L2 conducted all of its own due diligence and negotiations through Adam Long, no doubt based upon his extensive experience, without assistance or input from Defendants. L2's negotiations with MoneyonMobile and the agreed-upon terms between those parties did not include any provisions to address the stock split complained of in the Complaint, as evidenced by the record in the litigation between L2 and MoneyonMobile ("L2 Capital, LLC v. MoneyonMobile, Inc. and Securities Transfer Corporation," Case No. 18cv03199, in the District Court of Johnson County, Kansas, Civil Court Department). Despite Adam Long's extensive experience with 100s of similar transactions, and contrary to the introductory statement in Paragraph 34, it was not the custom or practice of L2 or Adam Long to include any terms or provisions addressing "reverse stock splits" in any of the 40-50 transactions that L2 and Adam Long directed the Firm and Mr. Friend to document, only after Adam Long finished his own due diligence, negotiations, and reached ultimate agreement with L2's counterparties, which were reduced to term sheets subsequently provided to Mr. Friend to quickly document. A provision in a warrant that states that the warrant share amounts and exercise price do not adjust for a reverse

---

Examination), **Series 7** (General Securities Representative Examination), **Series 24** (General Securities Principal Examination), **Series 55** (Limited Representative-Equity Trader Exam), **Series 63** (Uniform Securities Agent State Law Examination), **Series 65** (Uniform investment Adviser Law Examination), **Series 66** (Uniform Combined State Law Examination), and **Series 79** (Investment Banking Registered Representative Examination). During that time period, Adam Long worked at five brokerage firms, including one firm that was expelled by FINRA in 2014.

Disclosures for Adam Long during that time period also include Bankruptcy in 2009, a civil bankruptcy judgment against Adam Long entered in 2014 in the amount of $906,501.00, and an additional civil judgment entered against Adam Long in 2015 in the amount of $25,000. *See:* https://brokercheck.finra.org/individual/summary/4661425#examsSection.

16

stock split is an extraordinary provision that would have been specifically negotiated for and identified in a term sheet, which did not occur in this transaction.

35.     Notwithstanding that the MoneyonMobile Transactional Documents drafted by Friend and Legal & Compliance did not address stock splits, Friend and Legal & Compliance advised L2 to move forward with the exercise of the 3rd and part of the 4th warrants as if the MoneyonMobile Transactional Documents provided that there was no adjustment of the number of common shares as a result of the stock split.

**ANSWER:**     Denied as phrased.

36.     Pursuant to Friend and Legal & Compliance's advice, on or about May 30, 2018, L2 executed and delivered an exercise notice, whereby L2 attempted to exercise the right to purchase 380,000 shares of common stock of MoneyonMobile by cashless exercise pursuant to the Third and part of the Fourth Warrants, based on the calculations in L2's exercise notice, prepared by Friend, which did not adjust for MoneyonMobile's reverse stock split. See May 30, 2018 Exercise Notice attached as Exhibit "H".

**ANSWER:**     Denied as phrased.  Exhibit H speaks for itself.  Adam Long directed Greg Share of L2 to draft the exercise notices pursuant to a spreadsheet that Adam Long provided him. Greg Share of L2 then submitted the exercise notices to MoneyonMobile and MoneyonMobile's transfer agent.

37.     In support thereof, on May 30, 2018, Legal & Compliance, issued a Rule 144 Opinion which stated, in relevant part, that "L2 Capital is deemed to have acquired the 380,000 shares on November 8, 2017 (at the latest), the funding date of the Fourth Tranche, and has satisfied the requisite six month holding period discussed above." The Legal & Compliance May

30, 2016 Rule 144 Opinion letter is attached as Exhibit "I".

**ANSWER:**   Denied as phrased.  Exhibit I speaks for itself.

38.     If the Warrants had been issued without an adjustment for the one-for-twenty stock split, then L2 would have obtained roughly twenty times more value than what it would have obtained if the Warrants were exercised prior to the stock split.

**ANSWER:**   Defendants admit that the allegations in Paragraph 38 would have created a windfall event that was not addressed by L2 and Adam Long's negotiated terms and directions to Mr. Friend concerning terms to be included in the transaction documentation.  Furthermore, MoneyonMobile has represented that it never discussed and would never have agreed to such terms that would have created a windfall in L2's favor, unilaterally.  L2 and Adam Long have represented that they never discussed such terms with MoneyonMobile prior to the consummation of the transactions with MoneyonMobile.  Contrary to L2's assertions, when terms addressing "reverse splits" are included in transaction documents, they typically contain repricing terms to address anti-dilution provisions and unintended windfalls that would have an extraordinary material impact on the economics of the transaction, as well as the value, ownership percentages, and related dilution of existing shareholders (expressly providing for the adjustment to apply in the event of a reverse split, so that the investor does not experience a windfall).  Critically, L2 and Adam Long were aware of the existing terms in the Warrants and never raised any concerns with the Defendants or sought to modify the provisions at any time.

39.     Upon receipt of the May 2018 Warrant Exercise Notice, the stock transfer agent, informed MoneyonMobile that, barring a court order enjoining or restraining it from doing so, it would issue the 380,000 Warrant Shares to L2 according to L2's calculation in the exercise

notice.

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 39 and must deny same.

40.     In response, MoneyonMobile filed an action in the District Court of Dallas County, Texas, 134th Judicial District (the "Texas Court"), seeking a temporary injunction to, among other things, enjoin and restrain the transfer agent from attempting to issue shares of MoneyonMobile common stock to L2, which temporary injunction was granted on or about June 7, 2018 (the "Texas Preliminary Injunction Action").

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 40 and must deny same.

41.     On June 11, 2018, L2 filed a lawsuit against MoneyonMobile and the transfer agent in the District Court of Johnson County, Kansas asserting claims for Breach of Contract, Declaratory Judgment and Injunctive Relief (the "Kansas MoneyonMobile Action").

**ANSWER:** Admitted.

42.     On June 26, 2018, the parties jointly filed a Stipulated Temporary Restraining Order in the Kansas MoneyonMobile Action pursuant to which all parties agreed to leave a TRO in place pending the Kansas Court's ruling on MoneyonMobile's motion for preliminary injunction.

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 42 and must deny same.

43.     On November 2, 2018 the Kansas Court entered and Order and Opinion granting MoneyonMobile's motion for preliminary injunction, and enjoing [sic] L2 "from taking any

action or undertaking any effort to seek, force or compel the issuance of common stock in [MoneyonMobile] to [L2] pursuant to the Common Stock Purchase Warrants that [MoneyonMobile] issued to [L2], unless an adjustment is made in the exercise notice to account for [MoneyonMobile's] one-for-twenty reverse stock split". See November 2, 2018 Order and Opinion of District Court Judge Paul C. Gurney, attached hereto as Exhibit "J".

**ANSWER:**   Exhibit J speaks for itself.

44.    In so ordering, the Court specifically found that "the evidence presented at the injunction hearing tends to indicate that the parties did not account for a stock split at the time the Warrant agreement was made." See Exhibit "J".

**ANSWER:**   Exhibit J speaks for itself.

45.    During the pendency of the Kansas MoneyonMobile Action the MoneyonMobile share price dropped from $10 per share to .20 cents per share.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 45 and must deny same.

46.    As a direct and proximate result of result of Friend and Legal & Compliance' breaches and negligence in failing to account or address stock splits in the MoneyonMobile Transactional Documents they prepared, negotiated and advised L2 to execute, L2 lost approximately Four Million Dollars ($4,000,000) in the MoneyonMobile transaction, and incurred significant legal fees and litigation costs.

**ANSWER:**   Denied.

### The Amedica Corp. Transaction- January 30, 2018

47.    L2 loaned Amedica Corporation ("Amedica") a total of approximately $840,000 by February 5, 2018, in separate tranches, pursuant to a Securities Purchase Agreement executed

on January 30, 2018, an 8% Convertible Promissory Note in the principal amount of $840,000, Common Stock Warrant Agreement, and Irrevocable Transfer Agent Instructions (the Amedica Securities Purchase Agreement, Convertible Promissory Note, Common Stock Warrant Agreement, and Irrevocable Transfer Agent Instructions shall be collectively referred to herein as the "Amedica Transactional Documents").

**ANSWER:**   The Amedica Transactional Documents speak for themselves.

48.     Friend and Legal & Compliance, on L2's behalf, drafted, negotiated and advised L2 to execute the Amedica Transactional Documents.

**ANSWER:**   Denied.   L2 and Adam Long conducted due diligence and negotiated terms with Amedica that were then provided to Mr. Friend to prepare documentation in accordance with the previously negotiated term sheet.

49.     After holding the Amedica warrants for six months, in or around August 1, 2018, L2 sought to move forward with the exercise of the Amedica warrants.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 49 and must deny same.

50.     Again, Friend and Legal & Compliance provided L2 the calculation for the exercise of the Amedica warrants, and in accordance with those calculations, on August 3, 2018, L2 executed an exercise notice in which it demanded, per Friend's calculations, that Amedica deliver 442,137 shares of its common stock to L2 in exchange for a full cashless exercise of the Warrant. See Amedica Exercise Notice dated August 3, 2018 for 442,137 shares attached as Exhibit "K".

**ANSWER:**   Denied as phrased.  The calculation was based on the negotiated terms and

term sheets provided by Adam Long to Mr. Friend and directed by Adam Long after L2 completed its due diligence and negotiations with Amedica.  Exhibit K speaks for itself.

  51. Friend and Legal & Compliance's calculation of the 442,137 shares was based on "the formula on page 2 of the warrant" and the "following paragraph from the 8-K filed on May 15, 2018":

> "Conversion Price.
> The Series B Preferred Stock is convertible into shares of Common Stock by dividing the stated value of the Series B Preferred Stock ($1,100) by: (I) for the first 40 trading days following the closing of this offering, $1.4512 (the "Conversion Price"), (ii) on or after July 12, 2018 but prior September 7, 2018, the lesser of? (a) the Conversion Price and (b) 87.5% of the lowest volume weighted average price for our Common Stock as reported at the close of trading on the market reporting trade prices for the Common Stock during the five trading days prior to July 12, 2018, and (iii) on or after September 7, 2018, the lesser of? (a) the Conversion Price and (b) 87.5% of the lowest volume weighted average price for our Common Stock as reported at the close of trading on the market reporting trade prices for the Common Stock during the five trading days prior to the date of the notice of conversion. In the case of (ii)(b) and (iii)(b) above, the share price shall not be less than $0.48 (the "Floor Price")."

See Friend Email dated August 6, 2018, Subject: Re: L2 Capital - AMDA - Warrant Exercise Notice, attached as Exhibit "L".

  **ANSWER:** Denied as phrased.  Mr. Friend's calculation was based on the negotiated terms and term sheets provided by Adam Long to Mr. Friend after L2 completed its due diligence and negotiations with Amedica.  Mr. Friend stated that the dilutive pricing appeared to be $1.4512 per share, but Adam Long directed Mr. Friend to use $0.48 as the dilutive pricing, based upon the floor price of Amedica's Series B preferred stock.  The decision and attempt to calculate the amount based upon an exercise price of $0.48 was entirely that of L2 and Adam Long.  Adam Long then directed Greg Share of L2 to prepare an exercise notice for Adam Long's execution and to submit it to Amedica and its transfer agent.   Further, Exhibit L speaks for itself.

52.     Amedica, through its counsel, challenged Friend and Legal & Compliance's calculations and L2's Exercise Notice based on ambiguity in the language of the Amedica Transactional Documents, drafted by Friend and Legal & Compliance, stating in relevant part "Adam, we've gone back through the warrant again and are still of the view that the language is clear that the adjusted strike price for the warrant is $0.6543/share and not the floor price specified in the Series B convertible note terms. If the language was ambiguous we might be more inclined to reach a settlement....We feel that the company's position in this case is in harmony with the language in the warrant. Even with the $0.6543 price, the result is an additional 242,000 shares which at a current market price of $0.46/share have an approximate value of $111,000. Again, if you want to resubmit the warrant exercise notice with the $0.6543 price we will process it promptly." See August 10, 2018 email of Kevin J. Ontiveros, Subject: Re: L2 Capital - AMDA - Warrant Exercise Notice, attached as Exhibit "M".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 52 and must deny same.  Further, Exhibit M speaks for itself.

53.     By email of the same date, L2's principal questioned Friend whether the "language [was] ambiguous?", to which Friend responded "This is a unique situation because they don't have the right to receive shares at the lower price in the future necessarily, it is just the lowest floor price that it can be reset to. If the preferred was convertible at $0.49 at any time after December 31, 2018, for example, then it would be clear that at some point in the future they would be entitled to this price. As the language of the convertible preferred reads, they may or may not be entitled to that price depending upon the market price at the time of reset. The argument can be made either way (which is usually the case) but the issuers resort to litigation in

many situations when this type of clause is being enforced (ratcheting to the lowest conceivable rather than the dilutive price that the 3rd party has the right to today). It may be best to just avoid the escalation and concede the pricing or hold on for future exercise." See August 10, 2018 emails between Adam Long and Friend Subject: Re: L2 Capital - AMDA - Warrant Exercise Notice, attached as Exhibit "N".

**ANSWER:**     Exhibit N speaks for itself.

54.     Based on Friend's advice to "concede the pricing", which was based on the ambiguity in the Amedica Transactional Documents he drafted and advised L2 to execute, on August 13, 2018, L2 advised Amedica's counsel that L2 would "take "[Amedica's] number" and L2 executed and delivered a new exercise notice dated August 2, 2018 using Amedica's share numbers, wherein it demanded that Amedica deliver 242,063 shares of its common stock to L2 in exchange for a full cashless exercise of the Warrant. See Adam Long email dated August 13, 2018, attached as Exhibit "O"; and Exercise Notice dated August 3, 2018 for 242,063 shares attached as Exhibit "P".

**ANSWER:**     Denied as phrased. Adam Long negotiated directly with Kevin Ontiveros of Amedica, and Adam Long expressly stated in his email that, "We are going to take your number as a show of good faith.  I do disagree with the analysis, but you are right, we did well on the note repayment and hopefully the company can appreciate what we did for them as well…"  Adam Long then directed Greg Share of L2 to submit a revised exercise notice based on the $0.6543 pricing, which Greg Share of L2 subsequently submitted to Amedica's transfer agent.  Exhibits O and P speak for themselves.

55.     With respect thereto, Legal & Compliance issued a Rule 144 Opinion which

stated, in relevant part, "L2 Capital is deemed to have acquired the 242,063 shares on February 5, 2018 (the date when the Note was fully funded), and has satisfied the requisite six month holding period discussed above." See August 3, 2018 Rule 144 Opinion letter of Legal & Compliance attached as Exhibit "Q".

  **ANSWER:** Denied as phrased.  Exhibit Q speaks for itself.

56. Ultimately L2's concession from Friend's calculation of shares to Amedica's calculation of shares, based on the ambiguity arising as a result of the Amedica's Transactional Documents, drafted by Friend and Legal & Compliance, caused L2 approximately $75,000 in losses.

  **ANSWER:** Denied.  To the contrary, at the conclusion of the Amedica negotiations, Adam Long advised Mr. Friend that the transaction was so profitable that he was willing to agree to Amedica's proposed terms concerning warrants.

57. Again, L2 discussed with Friend revising any future transactional documents to avoid the ambiguity raised by Amedica which caused the reduction in shares.

  **ANSWER:** Denied as phrased.

58. Friend agreed to "fix" the documents going forward.

  **ANSWER:** Denied as phrased.  Adam Long attempted to overreach, long after the closing of the transaction, but there was no "fix" to such a scenario.

### FTE Networks, Inc. Transaction- January 30, 2018

59. FTE Networks, Inc. ("FTE") was seeking $1,000,000 in funding, half of which L2 agreed to provide and the other half of which was to be funded by Peak One Investments, LLC, an entity unrelated to L2. See Jason Goldstein January 31, 2018 email to David Lethem of FTE attached as Exhibit "R".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 59 and must deny same.  Further, Exhibit R speaks for itself.

60.    As to L2's half of the funding, on January 30, 2018, L2 agreed to loan approximately $555,556 to FTE through a convertible debenture in the original principal amount of $555,556 (the "FTE Debenture"), a Securities Purchase Agreement and Irrevocable Transfer Agent Instructions (the FTE Debenture, Securities Purchase Agreement, and Irrevocable Transfer Agent Instructions shall be collectively referred to herein as the "FTE Transactional Documents"). The FTE Transactional Documents are attached hereto as Exhibit "S".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 60 and must deny same.  Further, Exhibit S speaks for itself.

61.    Friend and Legal & Compliance, on L2's behalf, drafted, negotiated and advised L2 to execute the FTE Transactional Documents. See, Friend January 29, 2018 email (without attachments) attaching draft FTE Transaction documents for L2's review, attached as Exhibit "T".

**ANSWER:**   Denied.  L2 and Adam Long conducted due diligence and negotiated terms with FTE that were then provided to Mr. Friend to prepare documentation in accordance with the previously negotiated term sheet.  Further, Exhibit T speaks for itself.

62.    L2 funded the amount of the FTE Debenture by wire transfer on February 2, 2018.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 62 and must deny same.

63.    It was at all times intended that the FTE Debenture would mature and be due six

months from the date of issuance, as outlined in the Letter of Intent dated January 26, 2018 and, if said loan was not paid back within 6 months, L2's debt would be converted to equity, provided however, that the conversion of debt to equity could not occur unless and until the note matured. See Peak One Letter of Intent dated January 26, 2018 attached as Exhibit "U"; and FTE Debenture at Paragraph 2, attached as Exhibit "S".

**ANSWER:**     Exhibits U and S speak for themselves.

64.     Despite the intent of all parties to the transaction, and specific instruction by L2 to Friend and Legal & Compliance, the FTE Debenture drafted by Friend and Legal & Compliance, and executed by the parties provided that the Debenture was due July 30, 2021 (3 years and 6 months, rather than the 6 months intended). See FTE Debenture, at paragraph 14, attached as Exhibit "S".

**ANSWER:**     Denied as phrased.  Exhibit S speaks for itself.  Further, the closing package that included the debenture was provided to Adam Long and L2, which negotiated the specific terms of the transaction, on February 2, 2018, before execution and at no time did L2 identify the error or raise any concerns.

65.     The FTE Debenture further included, at paragraph 14, a provision stating, in relevant part, "In the event of any inconsistency between the provisions of this Debenture and the provisions of any other Transaction Document, the provisions of this Debenture shall prevail." See Exhibit "S", at paragraph 14.

**ANSWER:**     Exhibit S speaks for itself.

66.     When the 6 months elapsed and L2 sought to convert the loan to equity the error as to the due date of the FTE Debenture was realized.

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 66 and must deny same.

67.    When L2 brought it to Friend's attention, Friend explained that it was "his scriviner's [sic] error", that it happens all the time, that he would correct the due date and forward a Revised Convertible Debenture to L2, and further advised L2 to send the unilaterally Revised Convertible Debenture directly to the transfer agent to convert, without informing FTE.

**ANSWER:**   Denied as phrased.  Adam Long maintained direct contact with FTE and sent the revised convertible debenture to David Lethem at FTE.  Adam Long decided to unilaterally send the revised convertible debenture directly to FTE's transfer agent instead of waiting for David Lethem of FTE to respond.

68.    L2 refused to send the Revised Convertible Debenture to the Transfer Agent without notifying FTE, and instead forwarded the Revised Convertible Debenture to FTE and explained by cover email if FTE had no issue with the revision that L2 would be forwarding a Conversion Notice the same day to the transfer agent. See Adam Long's August 6, 2018 email to David Lethem stating "Jason at Peak One brought to my attention there was a typo in our debenture. I'm attaching the corrected version for your records", attached as Exhibit "V".

**ANSWER:**   The intended transaction, including the term sheet, securities purchase agreement, and note all provided for a six-month term.  The scrivener's error in the debenture was apparently missed by L2, Adam Long, FTE, and all other related persons.  Nevertheless, Adam Long chose to forward the corrected version to the transfer agent, he apparently did so without first discussing with his counterparts at FTE.  Exhibit V speaks for itself.

69.    When L2 did not hear back from FTE, Friend and Legal & Compliance advised

L2 to act as if the correct maturity date was outlined in the executed FTE Debenture and to move forward with the equity conversion by executing and delivering the Conversion Notice as outlined in L2's correspondence to FTE, and in support thereof Legal and Compliance issued a Rule 144 opinion. See, L2 FTE Conversion Notice and Legal and Compliance Opinion Letter, collectively attached as Exhibit "W".

      **ANSWER:**    Denied as phrased. The original executed FTE Debenture was convertible upon an event of default.  FTE breached sections 17 and 19 of the debenture due to the issuance of other debt instruments that could convert at a discount to market, which was acknowledged by Adam Long in early August of 2018.  Adam Long emailed Mr. Friend with copies of convertible debt instruments issued by FTE in breach of FTE's obligations and covenants under the original executed FTE Debenture and ancillary documentation.  Specifically, Adam Long provided Mr. Friend with copies of a convertible redeemable note in the amount of $262,500.00, issued by FTE to SBI Investments, LLC 2014-1 on April 30, 2018, and a convertible redeemable note in the amount of $165,375.00, issued by FTE to SBI Investments, LLC 2014-1 on June 21, 2018 (collectively, the "SBI Notes").  The issuance of the SBI Notes resulted in a default under Section 10(e)(i) of the debenture, which allowed L2 and Adam Long to convert the original executed FTE Debenture regardless of the intended or actual maturity date of the original executed FTE Debenture.  Thus, the scrivener's error with respect to the maturity date was a moot point.  Further, Exhibit W speaks for itself.

      70.    On the same date FTE's counsel challenged L2's FTE Conversion Notice, stating in relevant part "[t]he Revised Debenture was not authorized, executed or delivered by FTE, and based upon our review of available documents and emails, it seems obvious that someone with

L2 unilaterally changed the due date on the Debenture to July 31, 2018 without the consent of FTE and circulated the Revised Debenture with the forged signature of David Lethem chief financial officer of FTE", and demanded "withdrawal or rescission of the Conversion Notice" by 12:00 p.m. the following day, and further advised that failure to withdraw the Conversion Notice would result in FTE seeking "injunctive relief together with a claim for damages, both actual and punitive", and further threatened to file criminal forgery claims against L2's principal, Adam Long. See August 6, 2018 Letter of C. Thomas Barton, Jr., attached as Exhibit "X".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 70 and must deny same.  Further, Exhibit X speaks for itself.

71.     On the same date, Friend responded to FTE's counsel letter claiming that the "2021 reference was a scrivener's error" [Friend's error in that he and Legal & Compliance drafted the FTE Transactional Documents] and that FTE's "threat of criminal action against L2, coupled with [FTE]'s knowledge of the six month maturity date (as confirmed in the ancillary documents and on phone discussions with respect to this transaction), arguably rises to the level of extortion." See Friend August 6, 2018 email to Thomas Barton Jr., attached as Exhibit "Y".

**ANSWER:**   Denied as phrased.  Exhibit Y speaks for itself.

72.     With the threat of criminal action by FTE, L2 immediately agreed to temporarily rescind the FTE Conversion Notice, and as a result of Friend and Legal & Compliance's error on the FTE Debenture and advice provided with respect thereto, L2 was forced to settle the dispute and entered into a confidential settlement agreement with FTE. See Adam Long August 7, 2018 email, attached as Exhibit "Z".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the

allegations in paragraph 72 and must deny same.  Further Exhibit Z speaks for itself.

73.    With regard to the FTE Transaction, and as a direct and proximate result of Defendants' actions and omissions with respect to the FTE Transaction, L2 suffered significant damages.

**ANSWER:**    Denied.  The debenture could not be converted absent an event of default. Notably, however, and unrelated to the six-month maturity date issue, FTE was already in default of various obligations under the transaction documents, including issuer's breach of Section 17 and 19 of the debenture, and refusal to honor its contractual obligations necessary to convert the debenture to stock.  Notably, on August 1, 2018, Adam Long advised Mr. Friend that FTE was in default as of April 30, as a result of the issuance of the SBI Notes, and directed the accrual of default interest.  As a result of FTE's other defaults, L2 already had the right to call and convert the debentures regardless of the scrivener's error issue.  Further, pursuant to subsequent SEC filings by FTE, the company took the position that all of the issued notes with L2 were never approved by FTE's Board of Directors, because a prior executive director purportedly forged the board consent necessary to approve the transactions.  Further, L2 ultimately entered into a settlement agreement with FTE whereby L2 made money on the transaction and was not damaged as alleged.

74.    Following this transaction, L2 ceased using Friend and Legal & Compliance for any new transactions, but continued to be represented by Legal & Compliance for legal work related to L2 transactions Legal & Compliance was previously involved in, and for certain Rule 144 Opinion letters.

**ANSWER:**    Denied as phrased.  The relationship between L2 and Mr. Friend and the

Firm soured in the first or second quarter of 2018 when L2 and Adam Long desired to engage in block trading of microcap stock, which Mr. Friend was not comfortable handling because the trading exemptions for such companies were often not current, based on lack of disclosures and related regulatory hurdles.  When Mr. Friend refused to facilitate required opinion letters for Adam Long's highly risky and potentially unlawful transactions, Adam Long took his business elsewhere.

### The Biostem Technologies, Inc. Transaction - September 2018

75.    By September 2018, L2 had negotiated and executed a term sheet dated September 24, 2018 with Biostem Technologies, Inc. ("Biostem") for a Private Placement by L2 with registration rights for the purchase of up to $10,000,000 of common stock of Biostem's Securities, and L2 was being represented by new counsel in this transaction. See Biostem Term Sheet is attached as Exhibit "AA".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 75 and must deny same.  As explained hereinabove, Defendants were never involved in due diligence or negotiations and had no involvement in the Biostem transaction on behalf of L2, because L2 was assisted by new counsel at that time.  Further, Exhibit AA speaks for itself.

76.    However, as provided in the term sheet, "closing was subject to mutual agreement of final documentation" between L2 and Biostem. See Exhibit "AA".

**ANSWER:**   Defendants do not have sufficient information to admit or deny the allegations in paragraph 76 and must deny same.  Further, Exhibit AA speaks for itself.

77.    The transactional documents for this Biostem investment, including a Registration Rights Agreement, Equity Purchase Agreement and Irrevocable Transfer Agent Instruction

("Biostem Transactional Documents") were drafted and provided by L2's new counsel to Biostem.

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 77 and must deny same. To be clear, none of the Defendants performed any services for L2 or Adam Long in connection with L2's proposed transaction with Biostem.

78. After receiving the Biostem Transactional Documents, L2 spoke to Biostem's Chief Financial Officer, Jason Matuszewski, who explained that Biostem's attorneys advised them not to enter into any transaction with L2.

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 78 and what a third-party might or might not have stated and, therefore, must deny same. However, Defendants deny that they advised Biostem or Jason Matuszewski not to enter into any transaction with L2.

79. When L2 asked who Biostem's attorney was, Jason Matuszewski advised that they were being represented by Laura Anthony of Legal & Compliance.

**ANSWER:** Defendants do not have sufficient information to admit or deny the allegations in paragraph 78 and what a third-party might or might not have stated and, therefore, must deny same. To be clear, Mrs. Anthony and the Firm do represent Biostem.

80. Neither Laura, nor Friend, nor anyone from Legal & Compliance spoke to or informed L2 of the adverse representation or sought a waiver of conflicts from L2 with respect thereto.

**ANSWER:** Denied as phrased. There was no adverse representation, conflict of interest, or need for Defendants to address its representation or to seek informed consent under

applicable Florida Bar Rules, 4-1.7 and 4-1.9, based on the specific nature of the Firm's and its attorneys' representation of Biostem and L2. *See, e.g.,* Rule 4-1.7, which provides:

> For example, a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other, but common representation is permissible where the clients are generally aligned in interest even though there is some difference of interest among them.

As admitted by L2 in Paragraph 72 of the Complaint, L2 was represented by new counsel in its proposed transaction with Biostem and Defendants. Defendants had no involvement with the proposed transaction documents for L2.

81.    As a result of Legal & Compliance's advice to Biostem, the transaction with L2 was not consummated, and L2 lost approximately 1.5 Million Dollars.

**ANSWER:**    Denied.  Without waiver of attorney-client privileged discussions between Mrs. Anthony and Biostem, it was legally impossible for Biostem to have performed the referenced "equity line" financing transaction proposed by L2, because Biostem was not subject to the Securities Exchange Act reporting requirements, did not file any reports with the SEC, did not regularly prepare or maintain audited financial statements, and did not have an outside accountant prepare quarterly or annual financial statements on an ongoing basis.  To the contrary, Biostem is a pink sheet company that does not file any public reports with the SEC.  To legally be able to file a registration statement as contemplated in any equity line transaction, Biostem would first need to become subject to the SEC reporting requirements and would also need to move from the pink sheets to the OTCQB tier of the Over-the-Counter Markets.  In order to do that, Biostem would need to satisfy various preconditions for eligibility and be willing to continue to meet the SEC reporting obligations, such as the referenced audited financial statements, reviewed quarterly financial statements and other preconditions and ongoing

compliance matters. Further, Biostem had previously been subject to the SEC reporting obligations and at the time that it ceased such reporting, had been delinquent with such obligations. It was highly likely that the SEC would have required that those delinquent reports be filed prior to allowing for a current registration. As of the date of this answer, not only has Biostem not satisfied the preconditions for an equity line transaction, but Biostem's last filed report was for the period ending September 30, 2018, and the company currently has a "stop sign" on the OTC Markets stock screener and is labeled as "Pink No Information." *See* https://www.otcmarkets.com/stock/BSEM/disclosure.

There were other considerations, such as lack of trading volume, that would have made the proposed transaction impracticable. In that context, Mrs. Anthony did not review or comment on the L2 documentation, but simply advised Biostem that it was not legally permitted to complete any such equity line financing transactions without meeting the preconditions and without being ready to continue with SEC reporting and compliance, generally, with any funding source. Mrs. Anthony never advised Biostem not to do business with L2.

Further, L2 knew or should have known that the Firm was acting as counsel for Biostem, since it was publicly available information that should have, and may have been discovered by L2 in the course of its due diligence. *See* https://www.otcmarkets.com/stock/BSEM/profile.

82. Defendants were continuously engaged by L2 from November 2016 through January, 2019 to assist and advise L2 on various loan and funding transactions, including specifically, drafting transactional documents, providing L2 advice related to L2's rights and obligations under the transactional documents, calculating shares to which L2 was entitled under the transactional documents, drafting and advising L2 on exercise notices, protecting L2's rights,

property and interests, and issuing Rule 144 legal opinions.

**ANSWER:** Denied. As admitted by L2 in Paragraph 72 of the Complaint, L2 was represented by new counsel in its proposed transaction with Biostem, not the Defendants.

83.     At all relevant times, L2 relied on the guidance and advice of Defendants, and depended upon them to appropriately draft the transactional documents, to advise L2 on its ownership and/or entitlement to money and/or warrants and/or shares thereunder, to protect L2's interests, and steps to be taken to ensure ownership and/or entitlement and/or repayment, and to maximize L2's returns on its investments.

**ANSWER:** Denied.

84.     As outlined more fully above, Defendants committed the following errors omissions, and breaches during its representation of L2 related to the loan/funding transactions described herein:

A.     Defendants knew and/or should have known of MoneyonMobile's publicly documented intention to effect a reverse share split and failed to properly draft the MoneyonMobile Transactional Documents to address the same with specific terms;

B.     Defendants failed to properly draft the Amedica Transactional Documents such that there were ambiguities and contradictions in the anti-dilution and ratchet protection provisions;

C.     Defendants failed to properly draft the FTE Transactional Documents, and the Debenture as drafted by Defendants provided that it was due July 30, 2021 (3 years and 6 months), rather than the 6 months intended;

D.     Defendants negligently advised L2 to unilaterally correct the due date outlined in the FTE Debenture and to act as if the intended 6 month maturity date was outlined in the executed FTE Debenture and to move forward with an equity conversion based thereon by executing and delivering a Conversion Notice based thereon;

E.     Defendants never advised, spoke to or informed L2 of any actual or potential conflict arising out of their adverse representation of Biostem, nor did they seek

or obtain a waiver of conflicts from L2 with respect thereto;

F.      Defendants failed to adequately protect and represent the interests of L2;

G.      Defendants failed to take immediate action and correct ambiguities in the transactional documents they drafted following the MoneyonMobile transaction – indeed ignored L2's pleas to take such action; and

H.      Defendants excessively charged L2 for work that was performed with gross negligence, or was performed contrary to the L2's interests or directions.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 85 and its subparts.

85.      As a direct and proximate result of the afore-described conduct of the Defendants, L2 has incurred substantial damages, as set forth above.

**ANSWER:**   Denied.  L2 was has not incurred any damages associated with any of the actual or proposed transactions set forth in the Complaint.  To the contrary, Adam Long and L2 negotiated highly profitable transactions that provided for discounted transactions, increased premiums, and included advanced fees charges that were in excess of the actual flat rate fees that L2 as actually charged by the Firm.

86.      The Defendants acted with malice, moral turpitude, gross negligence, reckless indifference, wantonness, oppression, and outrageous aggravation towards L2.

**ANSWER:**   Defendants vehemently deny the allegation set forth in Paragraph 86 and demand strict proof thereof.

87.      L2 had to incur and continues to incur significant additional legal costs to defend the claims made with respect to the above outlined transactions and to rectify the erroneous advice of and malpractice by Defendants.

**ANSWER:**   Defendants vehemently deny the allegations set forth in Paragraph 87 and

believe that any legal costs incurred by L2 were due to its voluntary decision to attempt to seek further gains from its business counterparts as part and parcel with its vexatious and predatory business and related litigation tactics.

Since the filing of this meritless action, Defendants have uncovered information demonstrating that Adam Long has an extensive and well-documented history of deceptive and predatory behavior and initiating retaliatory litigation. Since 2016, Adam Long and/or L2 have been involved in no less than six separate legal actions, not including appeals.

Notably, Adam Long's lack of credibility has been documented by the U.S. Bankruptcy Court and U.S. District Court for the District of Kansas. During Adam Long's Chapter 7 bankruptcy, the Bankruptcy Court refused to discharge a debt of $941,780.82 owed to a longtime family friend and his childhood football coach. The Bankruptcy Court found that the debt was non-dischargeable due to Adam Long's fraud and misrepresentation.

According to court documents, Yoder had loaned Long the aforementioned sum under the premise that the debt would be fully secured by Yoder being granted a mortgage on certain real estate with a commonly known address of 1000 W. 66th Terrace, Kansas City, Missouri 64113. On no less than three occasions Long assured Yoder that a mortgage had been recorded. In reality, no such mortgage ever existed. On September 18, 2015, on appeal from the Order and Judgment of the bankruptcy court, U.S. District Judge Julie A. Robinson affirmed the foregoing and specifically noted that:

> In this case, the bankruptcy court, as the trier of fact, resolved credibility issues in favor of Yoder, rather than Long, going so far as to characterize Long's testimony as contrived.

*See* https://ecf.ksd.uscourts.gov/cgi-bin/show_public_doc?2014cv2617-18.

**COUNT I**
**PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE**
**Plaintiff v. All Defendants**

88.     L2 realleges and reavers the factual allegations contained in the Paragraphs above as if fully set forth herein.

**ANSWER:**   Defendants re-alleges and reincorporates their answers to Paragraphs 1 through 87, as if they were fully set forth herein.

89.     Defendants were employed by L2 to represent them in the transactional matters described above.

**ANSWER:**   Denied.  L2 retained the Firm and Mr. Friend to provide certain limited legal transactional services for particular transactions as directed by L2 and Adam Long, following the completion of L2 and Adam Long's independent due diligence and negotiations with counterparties to transactions, following-which L2 would provide Mr. Friend with terms sheets for completion of documentation, based on L2's previously negotiated and agreed terms. Mrs. Anthony was not retained by L2 to represent it in any transaction described in the Complaint.

90.     Attorneys such as the Defendants have a duty to L2 to possess the skill and knowledge possessed by other members of the profession in similar circumstances, and must carry out L2's matters entrusted to their professional care with a reasonable degree of skill and knowledge.

**ANSWER:**   Defendants admit that attorneys have a duty to possess the skill and knowledge possessed by other members of the profession in similar circumstances, and must perform legal services with a degree of skill and knowledge.  Defendants deny the remaining

allegations and characterization of duty set forth in Paragraph 90.  Mrs. Anthony further denies

that she was ever personally retained to provide any legal services to L2 and, therefore, owed no

legal duty to L2.

91.    The Defendants materially breached that duty, and were negligent, careless,

willful, wanton, and/or reckless, in their performance of L2's legal representation.

**ANSWER:**    Defendants vehemently deny the allegation set forth in Paragraph 91.

92.    The Defendants failed to possess and exercise such skill and knowledge before,

during and after their representation of L2, in the following ways:

A.    Defendants knew and/or should have known of MoneyonMobile's publicly
documented intention to effect a reverse share split and failed to properly draft the
MoneyonMobile Transactional Documents to address the same with specific
terms;

B.    Defendants failed to properly draft the Amedica Transactional Documents such
that there were ambiguities and contradictions in the anti-dilution and ratchet
protection provisions;

C.    Defendants failed to properly draft the FTE Transactional Documents, and the
Debenture as drafted by Defendants provided that it was due July 30, 2021 (3
years and 6 months), rather than the 6 months intended;

D.    Defendants negligently advised L2 to unilaterally correct the due date outlined in
the FTE Debenture and to act as if the intended 6 month maturity date was
outlined in the executed FTE Debenture and to move forward with an equity
conversion based thereon by executing and delivering a Conversion Notice based
thereon;

E.    Defendants never advised, spoke to or informed L2 of any actual or potential
conflict arising out of their adverse representation of Biostem, nor did they seek
or obtain a waiver of conflicts from L2 with respect thereto;

F.    Defendants failed to adequately protect and represent the interests of L2;

G.    Defendants failed to take immediate action and correct ambiguities in the
transactional documents they drafted following the MoneyonMobile transaction –
indeed ignored L2's pleas to take such action; and

H.     Defendants excessively charged L2 for work that was performed with gross negligence, or was performed contrary to the L2's interests or directions.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 92 and its subparts.

93.     In performing work for L2, the Defendants neglected reasonable duties and operated under impermissible and unethical conflicts of interests.

**ANSWER:**   Denied.

94.     Defendants' negligence/professional malpractice was the direct and proximate cause of L2's substantial damages, in excess of Eight Million Dollars ($8,000,000), as set forth more fully above.

**ANSWER:**   Denied.

95.     The Defendants acted with malice, moral turpitude, gross negligence, reckless indifference, wantonness, oppression, and/or outrageous aggravation towards L2.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 95 and its subparts and demand strict proof thereof.

WHEREFORE, Plaintiff L2 capital, LLC hereby demands judgment against the Defendants, jointly and severally, for money damages, consequential damages, pre- and post-judgment interest, court costs, punitive damages, and such other and further relief as this Court deems just and proper.

**ANSWER:**   Defendants deny that L2 is entitled to Judgment.


**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**Plaintiff v. All Defendants**

96.     L2 realleges and reavers the factual allegations contained in Paragraphs 2-86

above as if fully set forth herein.

**ANSWER:**   Defendants re-alleges and reincorporates their answers to Paragraphs 1 through 87, as if they were fully set forth herein.

97.   L2 and Defendants has a relationship whereby L2 reposed trust and confidence in Defendants as its legal counsel.

**ANSWER:**   Denied as phrased.  L2 previously retained the Firm and Mr. Friend to provide certain limited legal transactional services for particular transactions as directed by L2 and Adam Long, following the completion of L2 and Adam Long's independent due diligence and negotiations with counterparties to transactions, following-which L2 would provide Mr. Friend with terms sheets for completion of documentation, based on L2's previously negotiated and agreed terms.  Mrs. Anthony was not retained by L2 to represent it in any transaction described in the Complaint.

98.   The Defendants have obligations and duties to represent L2 in a manner consistent with their common law fiduciary duties of loyalty, care and candor.

**ANSWER:**   Defendants admit that attorneys have certain duties and obligations to their clients depending on the scope of the engagement.  Mrs. Anthony denies that she was ever personally retained to provide any legal services to L2 and, therefore, owed no legal duty to L2.

99.   The Defendants owed a duty to L2 to act in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believe to be in the best interests of L2.

**ANSWER:**   Denied as phrased.  Further, Mrs. Anthony denies that she was ever personally retained to provide any legal services to L2 and, therefore, owed no legal duty to L2.

100.    The Defendants invited L2's utmost trust and loyalty as it's [sic] fiduciary and, as a result, L2 reposed the utmost of trust and loyalty in the Defendants.

**ANSWER:**   Denied as phrased.   Further, Mrs. Anthony denies that she was ever personally retained to provide any legal services to L2 and, therefore, owed no legal duty to L2.

101.    Defendants represented and promised to represent L2 in accordance with their duties of loyalty, care and candor, and free of conflicting interests.

**ANSWER:**   Denied as phrased.   Further, Mrs. Anthony denies that she was ever personally retained to provide any legal services to L2 and, therefore, owed no legal duty to L2.

102.    The Defendants intentionally and/or negligently violated the trust and confidence of L2 and thereby materially breached their fiduciary duties to L2, by virtue of the following acts:

A.    Defendants knew and/or should have known of MoneyonMobile's publicly documented intention to effect a reverse share split and failed to properly draft the MoneyonMobile Transactional Documents to address the same with specific terms;

B.    Defendants failed to properly draft the Amedica Transactional Documents such that there were ambiguities and contradictions in the anti-dilution and ratchet protection provisions;

C.    Defendants failed to properly draft the FTE Transactional Documents, and the Debenture as drafted by Defendants provided that it was due July 30, 2021 (3 years and 6 months), rather than the 6 months intended;

D.    Defendants negligently advised L2 to unilaterally correct the due date outlined in the FTE Debenture and to act as if the intended 6 month maturity date was outlined in the executed FTE Debenture and to move forward with an equity conversion based thereon by executing and delivering a Conversion Notice based thereon;

E.    Defendants never advised, spoke to or informed L2 of any actual or potential conflict arising out of their adverse representation of Biostem, nor did they seek or obtain a waiver of conflicts from L2 with respect thereto;

F.     Defendants failed to adequately protect and represent the interests of L2;

G.     Defendants failed to take immediate action and correct ambiguities in the transactional documents they drafted following the MoneyonMobile transaction —indeed ignored L2's pleas to take such action; and

H.     Defendants excessively charged L2 for work that was performed with gross negligence, or was performed contrary to the L2's interests or directions.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 102 and its subparts.

103.    As a direct and proximate result of the afore-described conduct of the Defendants, Plaintiff has incurred substantial damages, in excess of Eight Million Dollars ($8,000,000), as set forth above.

**ANSWER:**   Denied.

104.    The Defendants acted with malice, moral turpitude, gross negligence, reckless indifference to the rights of others, wantonness, oppression, and/or outrageous aggravation towards L2.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 104 and its subparts and demand strict proof thereof.

105.    If the Defendants' misconduct were permitted without rebuke, it would encourage others attorneys and fiduciaries to engage in such reprehensible misconduct.

**ANSWER:**   Denied.

WHEREFORE, Plaintiff L2 capital, LLC hereby demands judgment against the Defendants, jointly and severally, for money damages, consequential damages, pre- and post-judgment interest, court costs, punitive damages, and such other and further relief as this Court deems just and proper.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

**ANSWER:**   Defendants deny that L2 is entitled to Judgment.

## COUNT III
## BREACH OF CONTRACT
### Plaintiff v. All Defendants

106.   L2 realleges and reavers the factual allegations contained in the Paragraphs 2-86 above as if fully set forth herein.

**ANSWER:**   Defendants re-alleges and reincorporates their answers to Paragraphs 1 through 87, as if they were fully set forth herein.

107.   The attorney-client relationship between Defendants and L2 was created by a binding contract between the parties.

**ANSWER:**   Denied.  L2 retained the Firm and Mr. Friend to provide certain limited legal transactional services for particular transactions as directed by L2 and Adam Long, following the completion of L2 and Adam Long's independent due diligence and negotiations with counterparties to transactions, following-which L2 would provide Mr. Friend with terms sheets for completion of documentation, based on L2's previously negotiated and agreed terms. Mrs. Anthony was not retained by L2 to represent it in any transaction described in the Complaint.

108.   It was understood as part of the contract that Defendants had a duty to use their best efforts, with the requisite skill, knowledge and attention, to represent the L2's interests fully, diligently and free of conflict.

**ANSWER:**   Denied as phrased.  Further, Mrs. Anthony denies that she was ever personally retained to provide any legal services to L2 and, therefore, owed no legal duty to L2.

109.   L2 paid the Defendants substantial sums of money as consideration for their

representation under these terms.

**ANSWER:**   Denied as phrased.   Further, Mrs. Anthony denies that she was ever personally retained to provide any legal services to L2 and, therefore, owed no legal duty to L2.

110.   The Defendants materially breached that duty by failing to possess and exercise the requisite skill and knowledge throughout their representation of L2, in the following ways:

A.   Defendants knew and/or should have known of MoneyonMobile's publicly documented intention to effect a reverse share split and failed to properly draft the MoneyonMobile Transactional Documents to address the same with specific terms;

B.   Defendants failed to properly draft the Amedica Transactional Documents such that there were ambiguities and contradictions in the anti-dilution and ratchet protection provisions;

C.   Defendants failed to properly draft the FTE Transactional Documents, and the Debenture as drafted by Defendants provided that it was due July 30, 2021 (3 years and 6 months), rather than the 6 months intended;

D.   Defendants negligently advised L2 to unilaterally correct the due date outlined in the FTE Debenture and to act as if the intended 6 month maturity date was outlined in the executed FTE Debenture and to move forward with an equity conversion based thereon by executing and delivering a Conversion Notice based thereon;

E.   Defendants never advised, spoke to or informed L2 of any actual or potential conflict arising out of their adverse representation of Biostem, nor did they seek or obtain a waiver of conflicts from L2 with respect thereto;

F.   Defendants failed to adequately protect and represent the interests of L2;

G.   Defendants failed to take immediate action and correct ambiguities in the transactional documents they drafted following the MoneyonMobile transaction – indeed ignored L2's pleas to take such action; and

H.   Defendants excessively charged L2 for work that was performed with gross negligence, or was performed contrary to the L2's interests or directions.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 110 and its subparts.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

111. As a direct and proximate result of the afore-described conduct of the Defendants, L2 has incurred substantial damages, in excess of Eight Million Dollars ($8,000,000) as set forth above.

**ANSWER:** Denied.

WHEREFORE, Plaintiff L2 capital, LLC hereby demands judgment against the Defendants, jointly and severally, for money damages, consequential damages, pre- and post-judgment interest, court costs, punitive damages, and such other and further relief as this Court deems just and proper.

**ANSWER:** Defendants deny that L2 is entitled to Judgment.

## Any Allegations Not Answered, Qualified, or Denied

Any allegations in L2's Complaint not heretofore answered, qualified, or denied are hereby denied as though set forth specifically.

## AFFIRMATIVE DEFENSES

Defendants deny that Plaintiff L2 is entitled to any relief against them and assert the following affirmative defenses. By alleging the following Affirmative Defenses, Defendants do not agree or concede that they bear the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.  Defendants assert the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, for failure to state a claim for relief. Defendants did not breach any alleged duty or purported contract concerning Plaintiff sufficient to support its alleged claim. Further, Mrs. Anthony never

represented Plaintiff in connection with any transaction alleged in the Complaint and, therefore, did not owe Plaintiff any legal duty.

**SECOND AFFIRMATIVE DEFENSE**

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Defendants were not fiduciaries for or advisors to Plaintiff for the transactions alleged in the Complaint.  L2 retained the Firm and Mr. Friend to provide certain limited legal transactional services for particular transactions as directed by L2 and Adam Long, following the completion of L2 and Adam Long's independent due diligence and negotiations with counterparties to transactions, following-which L2 would provide Mr. Friend with terms sheets for completion of documentation, as a ministerial act, based on L2's previously negotiated and agreed terms. Defendants were not retained by L2 to represent it in any arms-length transactions with third-parties.

**THIRD AFFIRMATIVE DEFENSE**

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Plaintiff did not reasonably rely on any alleged representation or omission purportedly provided by Defendants.  To the contrary, the Firm and Mr. Friend were retained to provide limited transactional services to document transactions that were independently researched, negotiated, and for which terms were agreed between the parties to those transactions, without the aid or participation of Defendants, which merely provided ministerial acts.

**FOURTH AFFIRMATIVE DEFENSE**

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because the alleged losses, liabilities, costs, expenses or other damages or amounts of the type

48

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

for which Plaintiff seeks recovery, if any, were caused by the conduct of Plaintiff, itself, third parties, and/or forces over which Defendants do not, and cannot, exercise control, including but not limited to Adam Long, MoneyonMobile, Amedica Corporation, FTE Networks Inc., and other market forces.

## FIFTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part by the doctrine of estoppel. L2, without the aid or participation of Defendants, negotiated, conducted its own due diligence concerning the transactions referenced in the complaint, and created term sheets of its own for each alleged transaction, and exercised final control over the decision to enter into each alleged transaction.  Plaintiff did not retain Defendants to provide any advice or opinions regarding any alleged transactions, and none was given.  Thus, Plaintiff is estopped from claiming that it relied on Defendants regarding the transactions alleged in the Complaint.

## SIXTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Defendants' conduct was not the proximate cause of the alleged losses, liabilities, costs, expenses or other damages or amounts of the type for which Plaintiff seeks recovery, if any.

## SEVENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Defendants did not act with the requisite scienter for actionable fraud or negligent misrepresentations, based on any purported act or omission.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

## EIGHTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Plaintiff and its principal are sophisticated investors with extraordinary investment experience, who, after being made aware of all attendant risks associated with entering into the transactions alleged in the Complaint, knowingly assumed the risk that the transactions at issue might not achieve its desired objectives and might result in the alleged losses, liabilities, costs, expenses or other damages or amounts of the type for which Plaintiff seeks recovery, if any.  In particular, Plaintiff was aware of the terms of the governing agreements for each transaction alleged in the Complaint, and voluntarily entered into each alleged transactions with full knowledge of the express terms in each governing agreement.  Further, L2's principal, Adam Long, is an extremely sophisticated fund manager and former-licensed and registered broker with extraordinary investment experience on both the buy and sell sides of private equity transactions like the transactions referenced in the Complaint, reviewing paperwork for these types of deals, both before and after forming his own fund, L2.  L2 conducted all of its own due diligence and negotiations through Adam Long, no doubt based upon his extensive experience, without assistance or input from Defendants.

## NINTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Plaintiff contributed to and failed to mitigate any alleged losses, liabilities, costs, expenses or other damages or amounts of the type for which Plaintiff seeks recovery, if any.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

### TENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Plaintiff's own comparative fault.  Plaintiff's conduct, including but not limited to its voluntary participation in the transactions at issue in the Complaint and any conduct on its part that was fraudulent or unlawful, prevents it from recovering any alleged losses, liabilities, costs, expenses or other damages or amounts of the type for which Plaintiff seeks recovery.

### ELEVENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Plaintiff has not alleged, and has no basis to allege, conduct on the part of Defendants that would warrant an award of punitive, enhanced, or exemplary damages of any kind.

### TWELFTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.  L2 and its principal, Adam Long, have a well-documented history of engaging in deceptive behavior and engaging in self-serving dealings and/or retaliatory actions against former counterparties, business colleagues, family friends, and professionals. Plaintiff has asserted various claims for purported damages against Defendants for which Plaintiff has not actually been harmed and which circumstances Plaintiffs unilaterally created or exploited, having no relationship to Defendants.

### THIRTEENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, by the doctrines of *in pari delicto,* waiver, and estoppel.  Plaintiff retained the Firm and Mr. Friend to perform limited legal services in the form of ministerial acts to document transactions after-

the-fact, which transactions were already completed by Plaintiff and its counterparties, without the participation of any Defendants.  Plaintiff, alone, chose not to retain counsel to assist with the due diligence, negotiations, or related deal terms that controlled the transactions.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because after Plaintiff received the governing agreement concerning each transaction at issue in the Complaint, Plaintiff had actual or constructive knowledge as to the terms of each transactions and the risks associated with entering into any such transaction. Despite Plaintiff's knowledge of these facts, Plaintiff accepted the benefits and services rendered by Defendants. Plaintiff's acceptance of benefits evidences an intent on its part to relinquish its right to object to the type of transaction at issue. Consequently, Plaintiff has waived its right to object to the terms of the agreements it knowingly and voluntarily entered into. Alternatively, Plaintiff's acceptance of benefits after notice as to the terms of each transactions and the risks associated with entering into any such transaction estops Plaintiff from complaining of the transactions and Defendants' conduct as set forth in the Complaint.

## FIFTEENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Defendants, consistent with their agreement with L2, did not participate in the negotiations of the subject transaction or conduct any of the due diligence regarding the transactions ultimately agreed upon by Plaintiff, Adam Long, MoneyonMobile, Amedica Corporation, and/or FTE Networks Inc, but only performed ministerial acts.  Further, Mrs. Anthony did not provide any legal services to L2 pertaining to any of the transactions that are the

subject of the Complaint, and none of the Defendants provided any legal services to L2 pertaining to the proposed transaction with Biostem.

## SIXTEENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to establish that any conduct on the part of Defendants proximately caused Plaintiff any purported damages.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because Defendants did not undertake representation adverse to L2, or create any conflict of interest by any purported actions or inactions. Thus, there was need for Defendants to address their representation of Biostem Technologies, Inc. ("Biostem"), or to seek informed consent under applicable Florida Bar Rules, 4-1.7 and 4-1.9. Plaintiff either knew or should have known from publicly available records that the Firm represented Biostem. Plaintiff failed to establish any damages from Defendant's representation of Biostem, including the fact that Biostem did not actually enter into an equity line financing transaction with L2, because Biostem was not legally permitted to pursue any such proposed equity line financing transactions by L2, generally, from any funding source.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that Plaintiff's claims are barred, in whole or in part, because the alleged losses, liabilities, costs, expenses, or other damages or amounts for which Plaintiff seeks recovery, if any, are too speculative and uncertain.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

**<u>Verification of LAURA ANTHONY, ESQ.</u>**
**(PURSUANT TO 28 U.S.C. § 1746)**

Under penalty of perjury, I declare that I have read the foregoing Answer and Affirmative

Defenses and that the factual statements pertaining to me contained therein are true, to the best of

my knowledge and belief, unless otherwise stated to be "upon information and belief."

Dated this 24th day of July, 2019,

By: *<u>/s/ Laura Anthony, Esq.</u>*_____
LAURA ANTHONY, ESQ.


**<u>Verification of CHAD FRIEND, ESQ.</u>**
**(PURSUANT TO 28 U.S.C. § 1746)**

Under penalty of perjury, I declare that I have read the foregoing Answer and Affirmative

Defenses and that the factual statements pertaining to me contained therein are true, to the best of

my knowledge and belief, unless otherwise stated to be "upon information and belief."

Dated this 24th day of July, 2019,

By: *<u>/s/ Chad Friend, Esq.</u>*_____
CHAD FRIEND, ESQ.

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131

Respectfully submitted this 24th day of July, 2019.

                                      */s/ Joseph A. Sacher*
**JOSEPH A. SACHER**
Florida Bar No. 174920
**ANDREW R. SCHINDLER**
Florida Bar No.: 0124845
**GORDON REES**
**SCULLY MANSUKHANI LLP**
Miami Tower – Suite 3900
100 S.E. Second Street
Miami, FL 33131
Telephone: (305) 428-5339
Email: jsacher@grsm.com
Email: aschindler@grsm.com
Email: aruff@grsm.com

**Robert Einhorn**
Florida Bar No. 858188
**ZARCO EINHORN**
**SALKOWSKI & BRITO, P.A.**
One Biscayne Tower
S. Biscayne Blvd., Suite 3400
Miami, FL 33131
Telephone: (305) 374-5418
Email:  reinhorn@zarcolaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 24, 2019, a true copy of the foregoing was electronically filed with the Clerk of Court by using CM/ECF, which will serve a copy of this document by electronic notice to the parties identified on the following Service List.

*/s/ Joseph A. Sacher*
Joseph A. Sacher

## SERVICE LIST

**Evan L. Frank, Esq.**
Bar No. 0099761
**ALAN L. FRANK LAW ASSOCIATES, P.C.**
135 Old York Road
Jenkintown, PA 19046
Telephone: (215) 935.1000
Facsimile: (215) 935.1110
E-mail: efrank@alflaw.net

*Attorneys for Plaintiff L2 Capital, LLC*

**GORDON REES SCULLY MANSUKHANI**
100 SE Second Street, Suite 3900, Miami, FL 33131